**UNITED STATES of America,
Appellee,**

**v.**

**Peter INSANA, Appellant.**

**No. 503, Docket 33831.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 5, 1970.

Decided April 6, 1970.

James Schreiber, Elkan Abramowitz, Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, for appellee.

Harry C. Batchelder, Jr., New York City, for appellant.

Before WATERMAN and ANDERSON, Circuit Judges, and BARTELS, District Judge.*

BARTELS, District Judge:

Peter Insana appeals from a judgment of conviction after a jury trial before the United States District Court for the Southern District of New York (Cooper, J.) convicting him of conspiracy to commit mail fraud, the substantive offense of mail fraud, and possession and abetting in the possession of stolen mail, thereby obtaining money by cashing a $43,000 stock certificate stolen from the mails.

Involved is the determination whether Insana was denied (1) his right of confrontation by the action of the prosecutor in reading the incriminatory grand jury testiomony of a co-defendant who had pleaded guilty and claimed a lack of memory, (2) due process because the prosecutor relied on the testimony of two co-defendants who had pleaded guilty but had not yet been sentenced, and (3) a fair trial because of the utilization of hearsay testimony.

Along with Insana, Leonard Parker, Howard Avery and Warren Schurman were indicted for the same offenses in violation of 18 U.S.C. §§ 371, 1341, 1342, 1708, and 2, but before trial Parker's case was severed and both Avery and Schurman pleaded guilty. Insana was sentenced to five years, Schurman to three years imprisonment, and Avery to a three-year suspended sentence. A brief summary of the facts appears as follows:

Parker was the author of the original scheme to commit the mail fraud which ultimately involved the other co-defendants, Avery, Schurman and Insana. The plot was originally hatched in March of 1968 when Parker met Avery in the Ham 'n Eggs Restaurant, owned by Avery's father, where Avery worked part time. At that time Parker induced Avery to enter into a general conspiracy to fraudulently transfer certain stolen securities, the profits of which were to be split between him and Avery on an 80%–20% basis. At another meeting in June of 1968 at the same restaurant Parker produced a stolen stock certificate representing 1,000 shares of McLouth Steel Corporation stock, worth approximately $43,000, which he gave to Avery, who two weeks later was successful in recruiting Schurman, another frequenter of the restaurant, to participate in the fraud of illegally cashing the same. At subsequent meetings, apparently at the same place, Avery and Schurman enlisted the services of Insana, another customer of the restaurant, to participate in the scheme by assisting in the paper details of the transfer. At the same time the conspirators decided to eliminate Parker from the scheme and agreed to split the proceeds of the venture three ways. Avery then delivered the stock certificate to Schurman, who together with Insana obtained a transfer certificate upon which they

* Of the Eastern District of New York, sitting by designation.

falsified a broker's signature and fabricated a false tax stamp.

One day in August of 1968 Schurman and Insana successfully transferred at the First National City Bank, the transfer agent, the McLouth stock certificate for ten newly issued certificates for 100 shares each of the McLouth Steel Corporation in the fictitious name of "Vincent Minetti," which misnomer had been assumed by Schurman. Later on the same day Insana and Schurman went to the office of Bache & Co. for the purpose of opening an account in the name of "Vincent Minetti" but the opening was delayed for proof of prior ownership of the securities and the Social Security number of "Vincent Minetti." ˎ

To furnish the information requested by the broker, Schurman and Avery opened an account with a mail receiving and telephone answering service in Union City, New Jersey, in order to insure that any correspondence mailed by Bache & Co. to "Vincent Minetti" would be received and acted upon by them. The Social Security number was given to Bache & Co. over the telephone and the signature on the letter purporting to be from Vincent Minetti's mother was forged by Avery, whereupon the broker proceeded to open the account. The postal authorities, however, had been notified, and all three defendants were apprehended shortly after emerging from the broker's office.

Before Schurman was indicted he appeared, on October 3, 1968, before the grand jury on the advice of his counsel and testified in full detail, and again, on October 31, 1968 with counsel present, he gave a full statement in the office of the United States Attorney. A few days before trial, on May 12, 1969, Schurman appeared at the United States Attorney's office for trial preparation and indicated for the first time that he did not wish to testify against Insana. The Government called in support of its case Avery, who voluntarily testified, and Schurman, who had been subpoenaed. Insana did not take the stand.

At the beginning of his testimony Schurman reluctantly identified Insana and then admitted that he had a conversation with Insana and Avery in July of 1968 in the Ham 'n Eggs Restaurant and also that he had discussed the transfer of the stolen stock certificate with them at the restaurant. Thereafter he became unresponsive, stating that "I don't want to hurt nobody." When asked to identify the corporate stock certificate he said "I don't remember it." [1]

After mumbling and giving vague and evasive answers to questions posed by the Government with respect to the very facts to which he had previously testified before the grand jury, the Government requested that Schurman be declared a hostile witness. The court so ruled and permitted the Government to lead the witness and to impeach him by the use of his prior grand jury testimony.[2] This was accomplished by

---

[1.] In the absence of the jury the court in describing the conduct of the witness used these words:

"I have excused the jury because I want to talk very frankly here. It must be clear to everybody who looks at this witness that he is faking and he is attempting to avoid giving answers. ˎ

"His mumbling, the movements of his face and hands show a determined purpose on his part not to give anything unless it is extracted from him. This is to the enjoyment and gratification of the defendant, which the defendant has reflected by smiles of approval.

"It is quite evident, in other words, that this witness has in mind avoiding testifying because he believes it is very likely to involve the defendant.

"We are here to get the truth and I do not think it lies in the lips or the mind of any witness to thwart the truth purposely. This is a piece of hypocracy [sic] which is as plain as the nose on your face, and I don't think we ought to allow a mockery of justice to be displayed so openly and so indifferently."

[2.] Before doing, so, however, the court asked Insana's counsel whether he had any better suggestion or any objection

permitting the Government to read the questions posed to Schurman and his answers before the grand jury with respect to the meetings at the Ham 'n Eggs Restaurant, the identification of the stock certificate, and the fabricated transfer stamp upon the stock certificate. After completing the reading of portions of the testimony, Schurman was asked whether those questions were posed to him and whether he gave those answers. He said at one point "If he says I said it, I guess I did," and later, "I don't remember," again, "If he has it on the record I guess I must have," and further on, "I don't recall." At the end of Schurman's examination by the Government, the defense counsel stated, "I object to the procedure by which he [Government's counsel] was allowed to lead the witness." In reply the court remarked that the defense counsel made no objection to the procedure until after Schurman's examination had been completed. Subsequently Insana moved unsuccessfully to strike the grand jury testimony from the record.

■■ Insana's first contention upon appeal is predicated upon a claimed denial of his Sixth Amendment right to confront Schurman, the witness against him, alleging that no effective cross-examination of Schurman with respect to extrajudicial inculpatory statements was possible since Schurman stated that he could not remember the relevant facts, citing in support of this contention Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Douglas v. Alabama, 380 U. S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). We disagree. Schurman took the stand and was at all times available for cross-examination. We are far from convinced that such cross-examination would have been fruitless in view of his obvious desire to help Insana. These facts are quite different from the factual patterns in Bruton and Douglas, where the defendant had no opportunity

to cross-examine the author of the extrajudicial inculpatory statement because he was legally unavailable. The rationale of Bruton does not apply where the party making the statement takes the stand and is available for cross-examination (see United States v. Ballentine, 410 F.2d 375 (2d Cir. 1969); Rios-Ramirez v. United States, 403 F.2d 1016 (9th Cir. 1968), cert. denied, 394 U.S. 951, 89 S.Ct. 1292, 22 L.Ed.2d 486 (1969); Santoro v. United States, 402 F.2d 920 (9th Cir. 1968); United States v. Marine, 413 F.2d 214 (7th Cir. 1969)); nor does the failure of the defendant to cross-examine because he believes such examination would be fruitless render the witness unavailable for such examination. See Wade v. Yeager, 415 F.2d 570 (3d Cir. 1969), cert. denied, 396 U.S. 974, 90 S.Ct. 466, 24 L. Ed.2d 443 (1969); United States ex rel. Hundley v. Pinto, 413 F.2d 727 (3d Cir. 1969). But see Townsend v. Henderson, 405 F.2d 324 (6th Cir. 1968), and West v. Henderson, 409 F.2d 95 (6th Cir. 1969).

■■ Insana's second claim is that the Government deliberately delayed sentencing both Avery and Schurman, accomplices, after they pleaded guilty prior to the trial, until they had testified at the trial. By utilizing this procedure he argues that the Government exerted undue influence upon the witnesses, resulting in a denial of his right to due process. The authorities have uniformly rejected this argument. The general rule is that the mere fact that a witness hopes to receive a reduced sentence or some other form of leniency does not disqualify him as a witness but affects only the weight of his testimony. United States v. Rainone, 192 F.2d 860 (2d Cir. 1951); DeRosier v. United States, 407 F.2d 959, 962–963 (8th Cir. 1969); Darden v. United States, 405 F. 2d 1054, 1056 (9th Cir. 1969); Brown v. United States, 126 U.S.App.D.C. 134, 375 F.2d 310, 315 (1967), cert. denied,

to leading the witness by means of his grand jury testimony. The defense counsel replied at one point "I don't have a

better suggestion" and at another point, "It may be prejudicial to the defendant."

388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); United States v. Vida, 370 F.2d 759, 767–768 (6th Cir. 1966), cert. denied, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630 (1967); Diaz-Rosendo v. United States, 357 F.2d 124, 130 (9th Cir. 1966), cert. denied, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966). What is important in this situation is that the jury have full knowledge that the accomplices have pled guilty and are awaiting sentence, that the defense counsel has an opportunity to cross-examine the witnesses upon their motives to falsify and to focus upon this in his summation, and that the judge instruct the jury that in weighing the testimony of such witnesses they give adequate attention to the motives which may underlie such testimony. These safeguards were amply observed in this case and we thus conclude that the procedure did not violate appellant's rights to due process or a fair trial.

Finally, we can hardly escape noticing the hearsay objection posed by the prosecutor's reading of Schurman's grand jury testimony, although not specifically raised at the trial or upon the appeal. It is well recognized under the hearsay rule that unless some exception exists it is error to admit evidence of prior extrajudicial statements to prove the truth of the matter asserted. It has been suggested, however, that when a prior statement is made under oath before the grand jury and the author is available for cross-examination at the subsequent trial, the prior testimony should be excepted from the hearsay rule. See the Preliminary Draft of the Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 8–01(c) (2) (iv), March 1969. Under such a rule Schurman's prior grand jury testimony would clearly be admissible. This approach, however, paints with a rather broad brush for it takes within its purview all relevant statements made by a witness before a grand jury whether or not such statements are inconsistent with the witness's in-court testimony. A narrower approach would be to admit evidence of prior grand jury testimony under the familiar "inconsistent statement" exception to the hearsay rule. The question presented by the latter approach under our present rules is whether former sworn testimony with respect to the facts can be considered inconsistent with a present disavowal of memory of those facts. Since under the particular circumstances of this case we answer the question in the affirmative, we have no occasion to pass upon the broader suggestion made in the Proposed Rules of Evidence.

The conclusion that prior testimony inconsistent with a present lack of memory may be admissible as a contradiction is not a novel one. Dean Wigmore has suggested that, in certain cases, where a defendant claims an inability to recollect a matter, a former affirmation of it should be admitted as a contradiction. III Wigmore, Evidence, § 1043 (3d ed. 1940). The reason Wigmore advances in support of this principle is that an "unwilling witness often takes refuge in a failure to remember, and the astute liar is sometimes impregnable unless his flank can be exposed to an attack of this sort." *Id.* The general theory of admitting a prior inconsistent statement is the cancellation of an adverse answer by which a party is surprised; however, where a witness gives no testimony injurious to the party calling him because of lack of memory, there is no reason or basis for impeachment under the rule. See Kuhn v. United States, 24 F.2d 910, 913 (9th Cir. 1928), modified on other grounds, 26 F. 2d 463, cert. denied, Lee v. United States, 278 U.S. 605, 49 S.Ct. 11, 73 L. Ed. 533 (1928); Goings v. United States, 377 F.2d 753 (8th Cir. 1967); Bushaw v. United States, 353 F.2d 477 (9th Cir. 1965), cert. denied, 384 U.S. 921, 86 S.Ct. 1371, 16 L.Ed.2d 441 (1966); United States v. Duff, 332 F. 2d 702 (6th Cir. 1964). But as stated in Taylor v. Baltimore & Ohio Railroad Co., 344 F.2d 281, 284 (2d Cir. 1965), cert. denied, 382 U.S. 831, 86 S.Ct. 72,

15 L.Ed.2d 75 (1965), this analysis "is not quite the whole story."

■ Where, as here, a recalcitrant witness who has testified to one or more relevant facts indicates by his conduct that the reason for his failure to continue to so testify is not a lack of memory but a desire "not to hurt anyone," then the court has discretionary latitude in the search for truth, to admit a prior sworn statement which the witness does not in fact deny he made. Cf. Di Carlo v. United States, 6 F.2d 364 (2d Cir. 1925), cert. denied, 268 U.S. 706, 45 S. Ct. 640, 69 L.Ed. 1168 (1925). To be sure there may be circumstances where the witness in good faith asserts that he cannot remember the relevant events. In such circumstances the trial court may, in its discretion, exclude the prior testimony. Cf. United States v. Nuccio, 373 F.2d 168, 172 (2d Cir. 1967), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967), reh. denied, 389 U. S. 889, 88 S.Ct. 16, 19 L.Ed.2d 199 (1967). However, this does not mean that the trial judge's hands should be tied where a witness does not deny making the statements nor the truth thereof but merely falsifies a lack of memory. Here Schurman had testified in detail before the grand jury, had already pleaded guilty, and on the stand identified Insana and testified to two relevant events. Based upon these facts, the only rational conclusion is that Schurman was fully aware of the content of his grand jury testimony but wished to escape testifying against Insana and thus make a mockery of the trial. By conceding that his lack of memory was due to his desire not to hurt anyone, he impliedly admitted the truth of the extra-judicial statements harmful to the defendant. Thus we believe that these statements are admissible not only to impeach his claim of lack of memory but also as an implied affirmation of the truth. This conclusion is consistent with our qualification of the hearsay concept set forth in United States v. DeSisto, 329 F.2d 929 (2d Cir. 1964),

cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), and as discussed in United States v. Nuccio, *supra,* at 172–173.

Affirmed.