**UNITED STATES of America,**

v.

**Marcellus REID, Defendant.**

**Criminal Action No. 3:98CR64.**

United States District Court,
E.D. Virginia,
Richmond Division.

July 28, 1998.

John Kenneth Zwerling, Lisa Bondareff Kemler, Zwerling & Kemler, P.C., Alexandria, VA, Mark J. Rochon, Rochon, Roberts & Stern, Washington, DC, for Marcellus Reid, defendant.

David John Novak, Hannah Lauck, United States Attorney's Office, Richmond, VA, for U.S.

## MEMORANDUM OPINION

SPENCER, District Judge.

THIS MATTER is before the Court on two motions. The first is a motion by defendant Marcellus Reid to suppress testimony of certain government witnesses under the reasoning of *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), *reh'g en banc granted, opinion vacated*, No. 97–3178 (10th Cir. July 10, 1998). The second is a motion by the defendant to suppress certain evidence. For the reasons stated below, the Court DENIES both motions.

### I. Motion to Suppress Testimony of Government Witnesses Pursuant to Singleton

Reid moves to suppress the testimony of all witnesses that have received or been promised anything of value for their testimony. His motion is based on the three-judge panel decision in *United States v. Singleton*, where the Court held that any promise made by the government to a witness in exchange for truthful testimony violates the criminal gratuity statute, 18 U.S.C. § 201(c)(2). At the outset, the Court wants to make it clear that the holding in the *Singleton* case is not the law in the Fourth Circuit. In addition, the Court notes that the *Singleton* decision has been vacated by the Tenth Circuit; consequently, there is no place in this country where it is legally binding. However, as the defendant has presented to this Court the issue raised in *Singleton*, that is, whether a U.S. Attorney's promises in exchange for truthful testimony violates the law, the following analysis is necessary.

The criminal gratuity statute at issue in *Singleton* and here states, in relevant part:

> Whoever ... directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony ... as a witness upon a trial, hearing, or other proceeding ... shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). According to the three-judge panel of the Tenth Circuit, the U.S. Attorney's promises in its case [1] constituted "things of value" that were "for or because of" the coconspirator's testimony in the *Singleton* trial. To reach its decision, the Tenth Circuit first looked at the "statutory plain language" of Section 201(c)(2), which the Court suggested was broad. 144 F.3d at 1344–46, 1998 WL 350507 at *3–4. The Court broadly construed "whoever" and held that the class of persons that can violate the statute includes U.S. Attorneys. However, this Court disagrees.

### *Section 201(c)(2) Does Not Apply to the U.S. Attorney*

In *Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), the United States Supreme Court described a canon of statutory construction where a statute does not apply to the government or affect governmental rights unless the text of the statute expressly includes the government. *Id.* at 383, 58 S.Ct. 275. The Supreme Court stated that the canon has been applied in two kinds of situations. "The first is where an act, if not so limited, would deprive the sovereign of a recognized or established prerogative title or interest." *Id.* at 383, 58 S.Ct. 275. At the same time that the Court described this first exception, the Court noted that "[t]he rule of exclusion of the sovereign is *less stringently applied* where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." *Id.* at 383, 58 S.Ct. 275 (emphasis added). In reviewing this statement by the Supreme Court, this Court notes that the words "less stringently applied" were used, rather than a declaration that the exception *never* applies to government agents.

The second category described by the *Nardone* Court is "where a reading which

would include such [government] officers would work obvious absurdity." *Id.* at 384, 58 S.Ct. 275. In the instant case, the Government argues that applying Section 201 to standard plea agreements in this District (and all others) would "work obvious absurdity" and would run contrary to the criminal justice system which has been in place for decades. This Court finds the Government's arguments persuasive.

There are several legal examples as to how prosecutors have historically been supported by the federal courts in recommending leniency in exchange for testimony. In the *Whiskey Cases,* 99 U.S. 594, 25 L.Ed. 399 (1878), the Supreme Court recognized the practice:

> Prosecutors in such a case should explain to the accomplice that he is not obliged to criminate himself, and inform him just what he may reasonable expect in case he acts in good faith, and testifies fully and fairly as to his own acts in the case, and those of his associates. When he fulfills those conditions he is equitably entitled to a pardon, and the prosecutor, and the court if need be, when fully informed of the facts, will join in such a recommendation.

*Id.* at 604. Since the Supreme Court's recognition in the *Whiskey Cases,* there have been numerous implicit and explicit recognitions of the legitimacy of inducing witnesses to testify by offering them promises of leniency. An example not adequately dealt with in *Singleton* is *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), where a U.S. Attorney failed to disclose to the defense the government's promise to a government witness that he would not be prosecuted if he cooperated. The Supreme Court held that nondisclosure of the promise amounted to a violation of due process. While the Supreme Court did not directly

---

**1.** In the plea agreement, the U.S. Attorney promised: (1) not to prosecute the cooperator for any other violations of the Drug Abuse Prevention and Control Act stemming from his activities then under investigation (with the exception of perjury or related offenses); (2) to advise the sentencing court of the nature and extent of the cooperation provided by the coconspirator; and (3) to advise the state parole board of the nature and extent of his cooperation. *Singleton,* 144

F.3d at 1344. In return, the coconspirator agreed "in consideration of the items listed in paragraph 2 above ... [to] testify[ ] truthfully in federal and/or state court ...." *Id.* at 1344.

In the instant case, the United States concedes that the standard plea agreement and cooperation provisions used in the Eastern District of Virginia substantially mirror those at issue in *Singleton.*

address the issue of whether the promise itself was problematic, the Court did rule that the government must disclose a promise of leniency made to a key witness in exchange for that witness' testimony. The Court's holding implicitly suggests that the promises themselves are permissible.[2]

In any event, there is an endless number of federal cases among the Circuits in favor of plea agreements. In *United States v. Dailey*, 759 F.2d 192 (1st Cir.1985), the Court held that the risk of perjury created by the defendant's alleged accomplices' plea agreements was not so great that defendant's due process rights were violated by the admission of the accomplices' testimony at trial. In the words of the Court, "[l]ong ago the courts rejected the notion that the testimony of co-defendants and other interested witnesses was so likely to be unreliable that it should be excluded." *Id.* at 196. In *United States v. Barrett*, 505 F.2d 1091 (7th Cir. 1974), the Seventh Circuit held that the government has the authority to allow civil immunity in return for testimony and stated that "[i]f the government can excuse criminal or civil liability in settling a criminal case, surely it can use that power of compromise to obtain a guilty plea or to procure testimony in other proceedings. Both are legitimate objectives of plea agreements." *Id.* at 1102. *See also United States v. Kimble*, 719 F.2d 1253 (5th Cir.1983); *Lyda v. United States*, 321 F.2d 788, 794–95 (9th Cir.1963). If the concern is that plea agreements will taint witness testimony, as it seems to be in *Singleton*, this Court emphasizes that disclosure of the plea agreements to defense before trial, cross-examination of cooperating witnesses, and jury instructions all provide opportunity to ferret out false testimony that an interested witness might give because of a government promise. Also, most defendants who make plea agreements with the Government are made to understand that the agreements are not based on the conviction of anyone, rather they are based on truthful testimony.

With that said, the Court must agree with the Government that the second exception described in *Nardone* applies here. There is a long history of plea agreements of the type in *Singleton* being accepted by federal courts. As the Fifth Circuit has stated, "no practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *United States v. Cervantes–Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). In many cases, as stated by the First Circuit in *Dailey*, the most knowledgeable witnesses available to testify about criminal activity are indicted coconspirators. *See Dailey*, 759 F.2d at 196. In fact, this Court believes that there are situations where those individuals may be the only credible witnesses of criminal activity and, without their testimony, the government would not be able to obtain convictions. It is naive to assume that most coconspirators would be so altruistic as to abandon their own self-interest and testify for the very government that seeks a stiff sentence against them without a bargain being made. To prohibit prosecutors from making promises in exchange for testimony works an "absurd" result where crimes go unresolved because of worries about testimony that may be questionable, even though the system already has built-in safeguards concerning questionable testimony by interested witnesses.[3]

---

2. The *Singleton* Court believed, however, that *Giglio* could not be dispositive on whether the promises are permissible under Section 201(c)(2) because the question was not squarely presented to the Supreme Court.

3. For this Court to hold otherwise, the Court would have to ignore the intent of other federal statutes addressing immunity and sentencing reductions. Congress has codified aspects of the long-accepted bargaining practice between prosecutors and cooperating individuals, by passing a number of statutes, including: 28 U.S.C. § 994(n) (directing the Sentencing Commission to enact guidelines that allow for sentences under the minimum statutory sentence in order to take into account substantial assistance by defendants); 18 U.S.C. § 6003 (authorizing district courts to grant immunity to a witness where the Justice Department concludes a witness is likely to refuse to testify); 18 U.S.C. § 3521 (authorizing witness relocation by the Attorney General for a potential witness subject to danger).

In short, the right on the part of the prosecutor to make promises of leniency in exchange for testimony is as old as the institution of the criminal trial. This Court holds that a reading of Section 201(c)(2) that includes government attorneys would work "obvious absurdity" and, thus, this case falls within the canon expressed in *Nardone* that "the general words of a statute do not include the government or affect its rights unless the construction be clear and indisputable upon the text of the act."[4] Therefore, the motion to suppress testimony is DENIED.

## II. Motion to Suppress Evidence

The defendant also moves for an order prohibiting the government from introducing any evidence obtained as a result of the warrantless search of a 1988 Buick Regal, which the defendant claims that he owns. Specifically, the defendant would like to suppress information about the existence of secret compartments in the Buick.

The Government relates the following as background. On May 17, 1996, a grand jury sitting in Richmond returned an indictment charging Ronald and Stephen Zebrowski, Jr. with continuing criminal enterprise (CCE) and related narcotics offenses. After Ronald Zebrowski escaped from the custody of the Hanover County Sheriff's Department, where he had been in state custody at the time of indictment, an international manhunt ensued for the Zebrowski brothers. On July 14, 1996, Deputy United States Marshal Michael Moran learned that Stephen Zebrowski, Jr. was at a particular Red Roof Inn in West Palm Beach, Florida. He found out that Zebrowski was there with another Zebrowski organization member, Steven C. Jones and that they had rented two rooms. Apparently, they shared the rooms with a number of women and had three vehicles at the hotel, including the 1998 Buick Regal.

Moran subsequently arrested Zebrowski in a room where a woman named Karen Mitchell was present. When Moran interviewed Mitchell, she stated that she had driven the Buick Regal to Florida from Maryland and that the car belonged to Zebrowski. Zebrowski, who had denied that he was Stephen Zebrowski, Jr., claimed that his name was Brandon Murray and denied any connection to the car. When Moran asked Mitchell if he could search the car, she said yes, told him where the keys were, and gave him permission to use them. At that time, the hotel employees were also telling Moran that the cars had to be removed. Moran impounded the car and later conducted what the Government calls an inventory search of the car. After a drug-detecting dog checked the car and alerted to the presence of drugs, Moran looked for and found a secret compartment in the car.[5] However, he did not find any drugs in the car.

Ultimately Stephen Zebrowski, Jr. pled guilty to CCE and, as part of his plea agreement, consented to the forfeiture of the Buick Regal. On September 30, 1996, the Court entered an Order of Forfeiture. The defendant in the instant case (Reid) began an "innocent owner" claim of the car but withdrew his claim when he was informed that he had to give a deposition under oath. Still, the defendant claims that the car was registered to him and that this confers standing on him to now seek suppression of evidence obtained from the car.

The burden rests upon the defendant to establish standing prior to litigation of the suppression motion. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). "[O]wnership of the item seized is, by itself, insufficient to confer a privacy interest in the area searched. At most, an interest in the items found may be a factor considered when deciding whether there is a

---

4. Although this argument was not made by the Government, the Court also believes that Section 201(c)(2) does not apply to the U.S. Attorney because the first *Nardone* exception applies. The right on the part of the prosecutor to make promises of leniency in exchange for testimony is as old as the institution of criminal trial and must accurately be described as a "recognized or established prerogative title or interest" of the sovereign.

5. Moran knew Zebrowski was a large-scale drug trafficker that routinely used secret compartments to transport drugs from Florida. (*See* Govt.Opp.Mot. Suppress Evid, 3:96CR41 Indictment Attached, page 6, para. 6.)

privacy interest in the area searched." *United States v. Manbeck*, 744 F.2d 360, 374 (4th Cir.1984). In addition, the Fourth Circuit has recognized that a defendant may lack standing to challenge the search of property that he abandons. *See United States v. McDonald*, 61 F.3d 248, 255 (4th Cir.1995) (defendant lacked standing to challenge search of car that was abandoned off public highway).

The Government argues that the defendant abandoned his interest in the Buick when he gave it to Zebrowski to use in transporting drugs. The Government also points to the fact that the Buick was discovered by Moran in Florida, nearly 1500 miles away from Reid, and that the only person claimed by the individuals in the motel rooms to have ownership of it, Zebrowski, was denying any claim to the car. Indeed the Court has substantial question as to whether the defendant has standing simply because the car is registered to him, for he was in Maryland at the time the operative events occurred in Florida. In addition, one could make the argument that he abandoned the car.

 Even assuming standing, however, the Court believes that consent from Mitchell was sufficient to make the search of the car valid. "When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." [6] *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). This Court concludes that it was reasonable for Moran to believe that Mitchell had the authority to consent. After all, Mitchell was the only one claiming any connection to the car when the hotel needed it to be moved. Even if Moran was wrong in believing she had authority, the U.S. Supreme Court and the Fourth Circuit have ruled in other cases

that suppression is not necessary where the police officer's belief that a third party had authority to consent was reasonable. *See Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Kinney*, 953 F.2d 863, 866–67 (4th Cir. 1992).

 Since there is no temporal limitation on Mitchell's consent to search the car, her consent was valid until revoked. This means that Moran could have searched the car from tire to steering wheel two days after the consent was given. Consequently, the search at issue was valid. The motion to suppress is DENIED.

An appropriate Order shall issue

---

6. "Common authority" rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.*