**UNITED STATES of America**

v.

**Jonathan COOPER and Steven Lynn.**

**Cr. No. 86–44 L.**

United States District Court,
D. Rhode Island,
First Division.

Rendered April 10, 1987.

Decided June 19, 1987.

See also 821 F.2d 833.

Andrew Good, Boston, Mass., Edw. L. Gerstein, Providence, R.I., Albert F. Cullen, Jr., John Wall, Boston, Mass., Leonard O'Brien, Providence, R.I., Norman Zalkind, Boston, Mass., David L. Martin, Providence, R.I., for defendants.

Kenneth P. Madden, Asst. U.S. Atty., Providence, R.I., for U.S.

## BENCH DECISION

LAGUEUX, District Judge.

This matter is before the Court on the motions of defendants Lynn and Cooper to dismiss the indictment, or in the alternative, to exclude the testimony of Mitchell Fried, a potential government witness.

On Friday, March 13, 1987, the Court granted the motion of the defendants to have an evidentiary hearing on this matter.

The hearing was held on March 16, 18, 19 and 20, 1987. Oral arguments were heard on March 23, 1987. The Court has reviewed all the testimony and exhibits produced at the hearing and is now prepared to decide the matter. The Court had the advantage of having a transcript of this matter so that all the testimony could be reviewed.

In virtually every case over which I have presided for the last eighteen and one-half years which raises a fact issue, there is a bit of evidence which comes forth during the hearing that is the key that opens all the doors to the truth. This case is no exception. That key bit of evidence in this case comes from the lips of defendant Lynn, as testified to by FBI agents Frasoli and Schilling. They testified that they were assigned this matter in the late afternoon of December 2, 1986, and proceeded to wire Steven Lynn for a 7:00 P.M. meeting at Logan Airport with Mitchell Fried. These agents knew little about the background of this case. Essentially they were told that a government witness in a Rhode Island District Court drug case allegedly was going to make a demand for money from Lynn in exchange for altering his testimony. While wiring Lynn, the agents began to speculate as to what the money demand would be. Frasoli suggested $10,000. Lynn said "higher". Schilling suggested $50,000, whereupon Lynn said $250,000.

That statement by Lynn, coupled with all the evidence adduced at the hearing and all the other circumstances in this case lead me to several ultimate conclusions. (1) Lynn knew that would be the demand from Fried because he knew that such was the amount of money that Fried was to receive from the proceeds of the drug conspiracy back in 1981. (2) Fried had been done out of that money, and (3) Fried blamed Lynn and Cooper, at least partially, for that state of affairs. Therefore, I believe Lynn's testimony that, at the meeting at Logan Airport with Fried, Fried made a demand on a note pad for $250,000, plus five years' interest. That fits in perfectly. Fried wanted to be paid his share of the drug money

that was due him in 1981. At no time during that meeting did Fried indicate he would change his testimony if he did or did not receive that money. Rather, it is clear that Fried was demanding a sum of money, which in his mind was due him by Lynn and by the other drug co-conspirators from the transactions which occurred in 1981, and he wanted interest to boot. Therefore, the actual fact is that Fried was not extorting money from Lynn in exchange for altering his testimony, and it is clear to me that this conduct would not have been any different had the meeting taken place the next morning, December 3, 1986, at about 11:00 A.M.

Let us go back to the beginning of this scenario in order to trace a path to these ultimate factual conclusions. I will look at it through the eyes of Andrew Good, attorney for Steven Lynn. In fact, I will get into his head very extensively. Mr. Good was very anxious to testify in this case for reasons unknown to me. Generally lawyers do not make very good witnesses. There is a reason for that. Lawyers are trained to be advocates. So, rather than telling it as it is, they generally tell it as they would like to have it be. He filed an extensive affidavit which contains much hearsay and conclusionary material and many inaccuracies.

The reason that Good's affidavit is unreliable in many particulars is that it was devised as a continuing memorandum. Good used a computer to record his impressions as events occurred but he would amend those notes as time went on to reflect his inferences and conclusions as events took place in order to justify his conduct. Therefore, the affidavit does not accurately reflect factually what happened on a particular day or at a particular time. His testimony, which tracks that affidavit, thus suffers from the same infirmity. In any event, he put his credibility on the line in this case so I will have to judge the accuracy of his testimony.

Let us start at the beginning. When Good became Lynn's attorney, for purposes of this case in late October or early November 1986, he learned three things early on from Lynn himself and from Robert Kalina, who had represented another drug co-conspirator in a trial before Judge Selya and who had represented Lynn from time to time in his business affairs. Number one, he learned that Fried had been an excellent witness against the other co-conspirators in a trial before Judge Selya. Secondly, he learned from his own client, undoubtedly, that Fried would be a dangerous witness because he had been done out of his share of the drug conspiracy money and was blaming Lynn and Cooper, among others, for his problems in that regard. Third, Lynn had not had any face-to-face contact with Fried since the drug conspiracy days when the drug conspiracy was in operation in 1981 and therefore, Fried might have problems identifying Lynn at trial.

The first thing Good wanted to do was interview Fried to find out what kind of a witness he would be against Lynn and what identifications he could make, but he did not know how to reach him. He fell upon some extraordinary good luck in attempting to locate and get local counsel to represent Lynn in Rhode Island. Good had contacted Robert Mann who would not take the assignment but suggested some names. Good contacted the first name on the list and it turned out to be Edward Gerstein. When he talked to Gerstein about this matter over the telephone, Gerstein pointed out to him that he had been contacted a few days before by Zalkind, Cooper's lawyer, who had decided not to hire him. Gerstein pointed out to Good, as he had to Zalkind, that he had represented Fried's girlfriend when she was about to be called as a witness before the grand jury and had later been fired by her and that he leased office space from Walter Stone, Fried's attorney. Good decided to hire Gerstein as local counsel after talking with his client because that would give him ready access to Walter Stone and facilitate an interview with Fried. Good intended to use Gerstein for this purpose and later discard him when he was no longer useful. Good admitted that he taped his side of some telephone conversations with Gerstein without telling him. That indicates to me that Good is a clever

manipulator who cannot be completely trusted even by his own colleagues. Therefore, his testimony in this case about his motives for doing certain things must be viewed with a good deal of skepticism.

Good, without beating around the bush, asked Gerstein to contact Stone and try to set up an interview with Fried. Gerstein did contact Stone and Stone talked to his client, Fried, about the matter. Stone reported to Gerstein that Fried would consent to an interview by defense counsel but attached some conditions. The first condition was that his lawyer, Stone, had to attend the interview and the second was that Stone had to be paid for his time by the interviewers. The third and most important condition was that, before the interview, Fried and Lynn had to meet privately, face-to-face. Gerstein relayed that information to Good for the first time on November 19, 1986, when Lynn came to Rhode Island to be arraigned, while Good and Lynn were in Gerstein's law office.

Somewhere along in the next few days, Good began to hatch his little scheme and started to manipulate the situation. He wanted to have this one-on-one, in-person meeting between Fried and Lynn because he strongly suspected that Fried would make a demand for his drug money. Good wanted any such conversation recorded or monitored in some way so that it would sound like Fried was demanding money in exchange for altering his testimony. Having an interview with Fried was no longer the primary goal. The goal was to have this monitored meeting between Fried and Lynn and thus effectively destroy Fried as a witness in this case.

There was one fly in the ointment, however, and that was the identification issue. Good was uncertain that Fried could identify Lynn at the trial and he was concerned that, if something went awry in this one-on-one confrontation, this plan could backfire on him. Fried could now testify that he recognized Lynn as one of the co-conspirators back in 1981. So there was discussion between Good and Gerstein as to how this one-on-one meeting could be pulled off without compromising the identification is-sue. Good wanted to have his cake and eat it, too.

Finally, Gerstein, during a telephone call from Good, turned the phone over to Stone, who had just come into the office. Stone and Good made an arrangement for a dinner meeting in Boston on the evening of November 25, 1986. Good's appetite for that meeting had been enhanced by a statement Gerstein attributed to Stone. Stone had said that because Fried had problems identifying Lynn and Cooper from old photographs at grand jury time, Fried might be helpful to the defense. Fried had only identified one, either Lynn or Cooper, at that time, and Stone did not know which. It was passed on to Good simply as Fried might be helpful to the defense.

Good made certain that there were other lawyers at the meeting. Mr. Zalkind, Ms. Homan and Ms. Mizner attended with Good. Harvey Silverglate, Good's law partner and a self-proclaimed expert on greed, who was in on the planning stages for this bushwacking of Stone, decided not to attend because it would be overkill. Good had suitably briefed the other attorneys about his suspicions that Fried would be demanding money from Lynn and that Stone would probably be relaying that kind of information. Therefore, that fearsome foursome attended the dinner meeting with a predisposition to misinterpreting everything that Stone said. I believe Stone's version of what occurred at that meeting. I believe that Stone did not want his client to have a private meeting with Lynn because he thought that Fried was so angry with Lynn and Cooper that he might well physically accost either one of them in a face-to-face situation. Therefore, Stone was trying to be forthright in his assessment of Fried as a witness so that an interview, and thus a one-on-one meeting with Lynn and Cooper, would be unnecessary. Stone pointed out how unpredictable Fried was and cited instances. He was asked hypothetical questions which were confusing and which were framed in such a way as to cause any answer by Stone to create the impression that Fried was going to demand money in exchange for changing his testimony. When Stone requested

some straight questions, Zalkind asked him two. Number 1, would Fried testify any differently than his previous statements, and Stone answered, no. Number 2, would Fried identify the defendants Lynn and Cooper, in court, at trial, and Stone answered that he didn't know. He would only know that when Fried saw them at trial.

It is clear to me that, as a result of that conversation with Stone at the Hotel Meradian in Boston, Good, right then and there, changed his tactics and decided to stop worrying about the identification issue and go whole hog for a private meeting between Fried and his client, Lynn. So, out of the blue, at that meeting, Good told Stone that Lynn could be contacted in New York City at his restaurant and Zalkind told Stone that Cooper could be found in Hershey, Pennsylvania, at his business location. It is obvious at this point that Good wanted a Fried-Lynn one-on-one meeting to take place in New York, so that monitoring could be done by a private agent who would be ready to tape both sides of the conversation.

Stone left that dinner meeting thinking that the matter had been resolved and that the defense lawyers would not press for an interview because he had given them all the information they needed, or he could supply more if necessary. He chose not to advise Fried as to where Cooper and Lynn could be contacted and located. It is evident that Stone did not want his client to meet privately with either Lynn or Cooper because he was afraid of what his client might do. He feared physical violence because Fried was very angry with Lynn and Cooper for fouling up the drug conspiracy by not delivering the money to the bank, and he probably also suspected that Fried might make a demand for his drug money.

Within a few days, Good revised his strategy. He could not be sure that he would have surveillance available if Fried showed up in New York or Pennsylvania without warning. Good called Stone on November 28th and asked him if he had relayed the information on Cooper's and Lynn's locations to Fried. Stone stated that he had not, and Good asked Stone not

to do so. Whereupon, Stone tore up the notes that he had made at the dinner meeting as to the location of Lynn and Cooper. Good's efforts to get a Fried-Lynn one-on-one private meeting, however, continued. He called Stone on December 1 and told Stone that Fried could call Lynn at a New York number and make an arrangement for a meeting the next day. Stone called back on December 2, 1986, in the morning, and protested having such a meeting. He made a suggestion for an alternative—having the two parties sit in different rooms with opposing counsel and pass notes back and forth. That was not satisfactory to Good because that did not allow for the type of monitoring he wanted. He wanted a tape of Fried asking Lynn for money.

Good, knowing that Fried was only two days away from reporting to the Federal penitentiary at Allenwood, Pennsylvania, threw caution to the wind. He requested of Stone that Fried call the telephone number for Lynn in New York given the day before. It was for a phone booth where Lynn and Barry Silvers, a private agent, were poised with a trusty suction microphone to record the telephone conversations. Stone gave that information to Fried, who came to Stone's office later that morning. Fried made the calls and finally agreed with Lynn to meet at 7:00 P.M. that evening at the bus stop at the Eastern Airlines shuttle terminal. Good's prayers were answered. Now for the surveillance and monitoring! The horsefly in this ointment was that, under Massachusetts law, it is a felony to record a conversation without the consent of both participants. So Good, with the help of his name-dropping partner, Silverglate, tried to set up this sting operation by involving a Judge of the United States District Court in Massachusetts. Without going through the details, that failed. They then decided that the sting could be accomplished if they involved the United States Attorney's Office to do their dirty work for them. They contacted then-Acting U.S. Attorney from Massachusetts Robert Mueller and set up a meeting. They told him and his associates how Gerstein and Stone had suspiciously implied that Fried was going to demand money and

that Fried's expression, "pack a bag" over the telephone to Lynn that morning, indicated that Fried expected a delivery of money. Assistant Paul Healey, Jr. was put in charge of this matter. He secured the necessary agents and the sting operation on Fried was underway. That takes us to the time when Agents Frasoli and Schilling were wiring Lynn for the Logan Airport meeting.

During World War II and in certain Narragansett Beer commercials of a few years ago, an expression was used, "loose lips sink ships". Apparently, Mr. Lynn had never heard this expression because his slip of the lip while he was being wired caused Good's ship to be blown out of the water. His loose lip gives us the key to the truth in this whole scenario.

At the meeting at Logan Airport, there is no question that Fried demanded $250,000, plus five years' interest, as his share of the drug conspiracy proceeds. Lynn had no money to deliver so he made arrangements for a meeting the next morning at 11:00 A.M. at the same place. At the debriefing at the FBI offices later that evening, arrangements were made to determine whether the sting would go forward the following morning. The tape would have to be duplicated the next morning and delivered to Healey for audition. Only Healey could authorize a continuation of the sting.

At about 8:15 A.M. on December 3, 1986, the agents, Schilling and Frasoli, arrived for work. The first order of business was to get the tape made during the previous evening duplicated. That duplication process could not be speeded up. A technician undertook that task at about 8:15 A.M. and it was completed about one and one-half hours later. Then, two other duplicates were made in a more rapid fashion from the first duplicate. Agent Frasoli went with one duplicate to Healey's office so that he could listen to the tape and authorize continuation of the sting. This occurred about 10:15 A.M. Healey listened to the tape and had to stop and replay portions because of its lack of clarity. At about 10:45, he authorized surveillance of

the meeting with Fried scheduled for 11:00 A.M. The agents were there ready to wire Lynn who was also there. They did so as rapidly as possible and made their way to Logan Airport. They did not get there until a little after 11:15 and Lynn and Fried never made contact that morning. Fried was apparently there at 11 but left by 11:15.

The argument made by defendants' lawyers that the Government agents were at fault for missing this meeting just does not hold water. Healey and the federal agents had no obligation or duty to conduct a sting that morning, or even the night before. In any event, they acted reasonably, expeditiously and in accordance with Government policy in all respects. There was no intentional or bad-faith misconduct by Healey and the agents. There was no negligence of any kind. Even if they had gotten Lynn to the church on time, the results clearly would have been the same as the evening before—Fried wanting his drug money and Lynn unable to deliver an admission by Fried that he was extorting money for a change of testimony. Even if we assume that Fried was extorting money for a change of testimony, the result here would be the same.

Therefore, the first issue is whether the Government's alleged failure to gather this alleged exculpatory evidence on the morning of December 3 requires dismissal of the indictment. Defendants argue that, had the agents facilitated a more timely airport arrival by Lynn, clear evidence of Fried's alleged extortion scheme would have been obtained. There are no cases that support defendants' position so they contend that the Government's failure to gather such evidence was tantamount to a destruction of exculpatory evidence already in the hands of the Government.

■ In *U.S. v. Picariello*, 568 F.2d 222 (1st Cir.1978), the Court articulated a three-pronged test to be employed in determining whether governmental destruction of evidence requires dismissal of the indictment. First, the Court must determine whether the evidence was material to the question of guilt or the degree of punishment; sec-

ond, whether the defendant was prejudiced by its destruction; and third, whether the Government was acting in good faith when it destroyed the evidence. In short, it takes at least intentional, bad-faith destruction by the Government to cause dismissal of criminal charges.

■ The prosecution's duty, as set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, to preserve and disclose evidence favorable to the accused is equally applicable to evidence that a defendant may use to impeach the Government's witnesses by demonstrating bias or interest. *U.S. v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, assuming, *arguendo,* that the result of the scheduled airport meeting would have been as the defendants suggest and therefore would have been relevant to a jury's assessment of Fried's credibility, defendants have failed to demonstrate that the Government was under any obligation to gather such evidence.

■ The defendants rely on numerous federal decisions involving governmental suppression, loss or destruction of exculpatory evidence that has been within the Government's possession or control. However, none of the authorities cited suggest that the prosecution has an affirmative obligation to seek and obtain evidence favorable to the defense. In fact, *U.S. v. Tapia,* 738 F.2d 18 (1st Cir.), *cert. denied* 469 U.S. 869, 105 S.Ct. 217, 83 L.Ed.2d 147 (1984) suggests to the contrary.

In *Tapia,* a father and son were convicted of possessing and distributing cocaine and of a related conspiracy. Federal drug agents had utilized the services of an informant to purchase the substance. The informant had offered to cooperate in exchange for the agents' assistance in obtaining leniency for him on state criminal charges. At trial, the informant testified that, while present in the elder Tapia's apartment, he had purchased cocaine from the son. On appeal, the son contended that the informant's testimony should have been excluded. He argued, among other things, that the informant's background and motive to lie was such that the Government

should have either tape-recorded the apartment conversation or should not have used the informant's testimony. The Court of Appeals, however, concluded that exclusion was not necessary. In so doing, the Court held that the circumstances did not warrant an exception to the general rule that an informer's credibility is more properly left for jury determination. The Court added that it was aware of no case law suggesting that the Government must tape-record an informant's conversations. Thus, in *Tapia,* the Government did not bear the burden of obtaining potentially exculpatory evidence.

Similarly, in *Hilliard v. Spalding,* 719 F.2d 1443 (9th Cir.1983), the Court indicated that the prosecution had no obligation to obtain evidence that might exculpate the accused. Following a state court conviction on charges of rape, kidnapping and sodomy, defendant petitioned for a writ of habeas corpus alleging, among other things, that the Government had suppressed relevant evidence. The alleged victim had been taken by police to a hospital for examination. A physician obtained a sample of vaginal fluids, an examination of which revealed the presence of sperm. Although testing of seminal fluid taken from a victim cannot positively identify a defendant as the perpetrator, the test can exculpate the accused. The record, however, was silent on whether the sample had ever been turned over to the Government. Prior to trial, defendant had made a general request for any exculpatory evidence known to the state. The sperm sample was not among the materials produced by the prosecution.

The Court of Appeals, noting that it was unclear whether the prosecution ever had possession or control of the sample or had knowledge that it could be used to exculpate the defendant, remanded the matter for an evidentiary hearing. In so doing, the Court stated very clearly that this holding did not require the Government to take a sample.

I am satisfied that the Government agents here had no duty to continue the sting operation on December 3, and even if they did, there was no intentional, bad-faith conduct on their part. In any event, I am

satisfied factually that had the meeting occurred between Fried and Lynn on December 3, no additional useful evidence would have been secured.

For all these reasons, the motion of Lynn and Cooper to dismiss the indictment is denied.

The second issue is whether Mitchell Fried should be precluded from testifying at trial. The defendants contend that permitting Fried to testify at trial would deprive them of their right to a fair trial. In substance, defendants argue that Fried now has such a strong incentive to curry favor with the Government that his testimony is likely to be perjurious and their cross-examination ineffective.

■ In general, a witness' possible bias, prejudice or motive to lie is relevant to a jury assessment of the weight to be afforded to his testimony and is not a bar to its admissibility. Exclusion is appropriate only when the risk of perjury is so great that the defendant's due-process rights would be violated by admission of the proffered testimony. *U.S. v. Dailey*, 759 F.2d 192 (1st Cir.1985). Otherwise, traditional safeguards are adequate to protect a defendant's rights. "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966).

■ Many of the cases cited by defendants involve accomplices who testify pursuant to plea agreements or paid informants. A review of those cases reveals that such witnesses are generally deemed competent to testify. Although courts recognize that accomplices and other informants may have motives to lie, danger of perjury is more properly minimized through the use of the above-mentioned procedural safeguards than by exclusion of the witness' testimony. I am talking about the safeguards that were discussed extensively in *Dailey.* That is also pointed out in the *Hoffa* case and also in *Tapia*, and *United States v. Fallon*, 776 F.2d 727 (7th Cir. 1985). For example, in the case of an accomplice who has entered into a plea agreement, the safeguards to be employed include informing the jury of the exact nature of the agreement, affording defense counsel an opportunity to cross-examine the accomplice about the agreement, and specifically instructing the jury to weigh the accomplice's testimony with care. That is all pointed out in *Dailey* on Page 196. The veracity of an accomplice's testimony is a matter entrusted to the jury even where the accomplice's background is most questionable and his testimony uncorroborated.

Paid informants are generally permitted to testify subject to similar safeguards. Although there is apparently disagreement among courts, some, in certain circumstances, permit paid informants to testify even where payment is contingent upon a successful prosecution. For example, see *U.S. v. Valle-Ferrer*, 739 F.2d 545 (11th Cir.1984). None of the authorities cited by the defense are really on point. Even if we assume that Fried was demanding money from Lynn in exchange for a change in testimony, he should not be excluded as a witness. The jury should decide the facts based on all available information. They determine the credibility of the witnesses. Common sense dictates that even the greatest of scoundrels should not be excluded as a witness because he might be telling the truth in a particular instance. That is for the jury to judge.

The defense attorneys in this case are free to cross-examine Fried about his demand of money from Lynn and/or produce independent evidence thereof. Of course, that is a two-edged sword. It might well be that the putative stingers will end up being the actual stingees.

I am satisfied that there are no legal grounds for barring Fried as a Government witness in this case.

The motion of Cooper and Lynn to preclude Fried from testifying as a Government witness is denied.