UNITED STATES of America, Plaintiff,

v.

John J. SNELL, et al., Defendants.

No. CR 95–10084–NG.

United States District Court,
D. Massachusetts.

Aug. 25, 1995.

Richard M. Egbert, Law Office of Richard Egbert, Boston, MA and Ralph D. Gants, Palmer & Dodge, Boston, MA, for defendants.

Jeffrey Auerhahn, Office of the United States Attorney, Boston, MA, for the U.S.

## MEMORANDUM AND DECISION

GERTNER, District Judge.

Defendant John J. Snell, Jr. [hereinafter "Snell Jr."] and his father, John J. Snell, Sr. [hereinafter "Snell Sr."] are charged with operating an illegal gambling business in violation of 18 U.S.C. § 1955 (count II), conducting financial transactions involving the proceeds of illegal gambling activity in violation of 18 U.S.C. § 1956 (Counts III through VI) and conspiracy (Count I). On June 7, 1995, in response to the various discovery motions filed by the defendants, the Magistrate Judge issued an order, portions of which are the subject of motions for reconsideration by either or both defendants.

Snell Jr. moves for reconsideration of the Court's decision 1) barring the disclosure of *Brady* material[1] that also fits within the ambit of the Jencks Act, 18 U.S.C. § 3500 at a point earlier than the Jencks Act requires; 2) permitting the government to withhold information concerning promises, rewards and inducements where the information would also reveal the identity of a government witness; 3) refusing to order discovery with respect to a specific *Brady* item requested by the defendant, i.e. information concerning any witness' bias against Snell Jr.'s family. In addition, Snell Jr. moves for reconsideration of the order denying his motion for discovery concerning government's compliance with the *Petite* policy.

Defendant John J. Snell, Sr. [hereinafter "Snell, Sr."] seeks reconsideration of the denial of his motion for early disclosure of all Jencks material and joins in the motions of

---

1. This is material required to be produced under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and it progeny.

Snell Jr. for reconsideration of the Magistrate Judge's orders on exculpatory evidence (items 1 through 3 described above).

## I. MOTIONS CONCERNING BRADY MATERIAL

In the government's automatic discovery letter of March 24, 1995, it indicated that "one or more individuals whom the government anticipates will be witnesses" in the Snell case testified before the grand jury in return for statutory or "letter" immunity. In addition, one or more witnesses "received consideration in connection with criminal charges for their cooperation in this and other cases." Apart from this general notice, the Government refused to provide further discovery. It maintained this position even after a more specific request by counsel, taking the position that it was not obliged to turn over exculpatory evidence that also comprised Jencks material in advance of its obligations under the Jencks Act or evidence that would identify government witnesses. The Government also indicated that it would refuse to provide information concerning any witness' bias against Snell Jr.'s family. Two general issues were then joined: one concerning the timing of *Brady* disclosure, and the second, concerning its scope (identification of government witnesses, impeachment information). I deal with these issues *seriatim*.

### A. Brady v. Maryland and Local Rule 116.1.

The nub of the Government's claim that it need not turn over *Brady* material which also fits within its Jencks obligations until the

period of time spelled out in the Act, is summed up in the words of the Magistrate Judge—that the *Brady* requirement "does not trump the restrictions imposed by the Jencks Act." Order Regarding Various Discovery Motions, dated June 7, 1995 [hereinafter "Order"], p. 3.

■ I disagree. Local Rule 116.1 is quite clear, and appropriately melds the concerns of the Jencks act and *Brady v. Maryland*. If the evidence at issue is conceded to be *Brady* material, then it must be turned over immediately[2]; unless the Government meets the requirements for exempting the information from disclosure, (or delaying its production) namely, that the disclosure would be "detrimental to the interests of justice".[3]

*Brady* announced that due process obliged the prosecutor to turn over exculpatory material to the defendant. Exculpatory evidence was described as evidence that is "material either to guilt or to punishment", *Id.* at 87, 83 S.Ct. at 1197, or that "would tend to exculpate the defendant" or reduce his penalty, *Id.* at 88, 83 S.Ct. at 1197.

The court recognized that a government prosecutor stood in a unique position in the criminal justice system. He was an advocate in an adversary system, but, unlike the private advocate who must to try to win even if he feels his client should not prevail, the government prosecutor was required to insure that the outcome was a just one. While the advocate may want to keep information materially supporting his adversary's case from his opponent, the public prosecutor cannot.

---

**2.** Local Rule 116.1 provides for certain automatic discovery in criminal cases including, 116.1(a)(5):

"All exculpatory evidence within the meaning of *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)."

The rule requires that "[s]uch disclosure will be routine and automatic, i.e. without any court order in the particular case. It shall occur as soon as counsels' trial engagements permit and in all events within fourteen (14) days after arraignment."

**3.** Local Rule 116.1(d) provides for a procedure for exempting certain information from disclosure:

"If in the judgment of either party it would be detrimental to the interests of justice to make any of the disclosures set forth above, such disclosures may be declined and the opposing party advised in writing, with a copy to the clerk, of the specific matters on which disclosure is declined and the reasons for declining, within seven (7) days of the date of arraignment. If the opposing party seeks to challenge the declination, said party shall file forthwith a motion for further discovery accompanied by a supporting memorandum and appropriate affidavits."

On the surface, this obligation seems to give the defense an unfair advantage. In reality, however, it levels the playing field. The government begins gathering evidence from the moment law enforcement is involved; the defendant generally waits until charges are brought and counsel is obtained. While there surely are exceptions, the government typically has greater resources to gather evidence, and more tools to convince witnesses to assist their effort (the power to immunize, the prestige of government status, etc.) With *Brady*, the Court sought to eliminate only one of the prosecution's advantages, namely the ability to determine the outcome simply by withholding exculpatory information. Due Process, as well as the Sixth Amendment right to the effective assistance of counsel and the Fifth Amendment right to confront witnesses, would be hollow without *Brady* disclosures.

To be sure, there are limits. If courts were to define the *Brady* obligation broadly—for example, as an affirmative obligation to search out all possible defenses, essentially to do the work of the defense as well as that of the prosecution—it could fundamentally undermine the adversary system.[4] In the cases following *Brady*, the Court made the limits of the *Brady* obligation more and more clear. *See e.g., United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). With certain exceptions, the prosecutor is still obliged to act like an advocate, to gather evidence to support his case, and to make the strongest presentation of his side to the jury. The question then is one of definition—how to define the timing and scope of the Brady obligation consistent with the prosecutor's dual adversary and public functions.

In section B I will address the issue of timing and in section C, the scope of the obligation.

## B. *The Timing of Brady Disclosures: The Relationship of Brady and the Jencks Act.*

The Government takes the position that even material which clearly meets the *Brady* requirements need not be turned over until the Jencks Act requires such disclosures, i.e. after the witness has testified at trial. I disagree.

A few general principles are clear: If the material at issue is clearly *Brady* material, then it follows that it is important, if not essential, to the defense's ability to mount a defense and further, that the earlier the disclosure the more effective the defense use of it will be. Clearly, information obtained on the eve of trial, or worse yet, mid trial, is less effective to an advocate than information obtained earlier. *See e.g., United States v. Deutsch*, 373 F.Supp. 289, 290 (S.D.N.Y.1974) ("It should be obvious to anyone involved with criminal trials that exculpatory information may come too late if it is only given at trial, and that the effective implementation of *Brady v. Maryland* must therefore require earlier production in at least some situations." Exculpatory information affects the defense investigation, how it will allocate its resources, the voir dire questions the defense will seek, the framing of opening statements, the nature of the pre-trial research on evidentiary issues and jury instructions, in short, all of the strategic decisions which must be made long in advance of trial. If this society wants effective defense advocacy, which is, after all, the premise of the Fifth and Sixth Amendments and of the Due Process clause, then, within the limits of the adversary system, information which is exculpatory must be made available to counsel before the trial begins.[5]

---

4. Giving *Brady* an expansive reading "could have led to a system in which the prosecutor gathers and assembles all the facts—those helpful to his case, those neutral, and those favorable to the defense—and reveals the package completely. The defense would then choose for itself what it would present at trial. Such a development would transform the nature of the prosecutorial office. Instead of preparing his case as an adversary—selecting and emphasizing helpful facts while deliberately passing by those less advantageous—the prosecutor would instead resemble the neutral magistrate in the inquisitorial system." Babcock, "Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel," 34 Stan.L.Rev. 1133, 1139 (1982).

5. It would be hard to imagine anyone credibly arguing in a civil case that the production of clearly discoverable information should be put off until the trial, that counsel has enough time to digest the material after the witness had testified. The civil discovery rules recognize that effective advocacy and case management depend upon

To be sure, when exculpatory evidence is in the form of witness statements, the *Brady* obligation of pre-trial disclosure appears to be inconsistent with the Jencks act obligation of disclosure after a witness has testified, hence, the question of which law trumps which. It is inconceivable that a statutory obligation should supersede a constitutional one, especially where even the statutory obligations has a constitutional Due Process basis. The case on which the Jencks act was based, *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), held that criminal defendants were entitled to access to the prior statements of government witnesses testifying against them. Using language similar to that later used in *Brady*, the Court held that to deny disclosure was to "deny the accused evidence relevant and material to his defense" and to undermine the prosecutor's public role to achieve justice.[6] *Id.* at 667, 77 S.Ct. at 1013.[7]

Under the circumstances, I agree with the Court in *United States v. Narciso*, 446 F.Supp. 252, 270 (E.D.Mich.1977):

> effective trial preparation. On the criminal side, where liberty is at risk, this conclusion is no less clear. To the extent that criminal prosecutions also involve the kinds of issues typically not involved on the civil side—potential threats to witnesses, discovery of government investigations not related to the instant prosecution, etc.— they can be dealt with in motions for protective orders or motions for exemption from pretrial disclosure.

**6.** The Jencks act was passed to remedy a very specific problem. In the period after the decision, a number of lower federal courts allowed the defendants to rove at will through entire government reports, although only a small part of the reports of which related to the testimony of the government witness. H.R.Rep. No. 700 supra at 3, S.Rep. No. 981, 85th Cong., 1st Sess. 3 (1957), at 3–4; 1957 U.S.Code Cong. & Admin.News, 1861, 1862. Concerned that this would open the door to secret government files and confidential information to defendants which could handicap law enforcement and injure the reputations of innocent persons, see H.R.Rep. No. 700, 85th Cong., 1st Sess. 3 (1957) at 3, Congress enacted the Jencks act limiting the definition of the statements that were to be produced "written and signed," "otherwise adopted," or "a substantially verbatim recital" of an oral statement made "contemporaneously" and the timing of its production, on motion after the witness has testified at trial.

"[W]hen two principles of law conflict with one another the criminal justice system demands that the principle favoring greater discovery in favor the accused must prevail, particularly where, as here, the principle favoring disclosure is of constitutional origin."

Put otherwise, in seeking to harmonize the Jencks act and *Brady*, it makes no sense to indulge in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one, like Jencks. *See also, United States v. Poindexter*, 727 F.Supp. 1470 (D.D.C.1989).[8]

Local Rule 116.1 says as much: Discovery of exculpatory evidence "shall occur as soon as counsels' trial engagements permit and in all events within fourteen days after arraignment." Should there be problems with disclosure, either side can make a showing to the Court to seek an exemption "in the interests of justice." *See e.g. United States v. Five Persons*, 472 F.Supp. 64 (D.N.J.1979) (local rule requiring early disclosure of exculpatory evidence trumps Jencks act.)[9]

**7.** While *Jencks* did not explicitly ground the decision in the Constitution, subsequent decisions have so interpreted it. *See Palermo v. United States*, 360 U.S. 343, 362–63, 79 S.Ct. 1217, 1229–30, 3 L.Ed.2d 1287 (1959) (Brennan, J. concurring); *United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 533–34, 21 L.Ed.2d 537 (1969).

The defense in *Jencks* requested that witness statements be turned over after the witness had testified so that he or she could be effectively cross-examined. At the time of the trial, there was no Supreme Court case or statute establishing any obligation to turn over witness statements. Thus, the Court did not address the question of whether disclosure of such statements at an earlier point was necessary to meaningful and effective trial preparation.

**8.** "The Brady obligations are not modified merely because they happen to arise in the context of witness statements. The government therefore has the obligation to produce to defendant immediately any exculpatory evidence contained in its Jencks materials, including exculpatory impeachment material, and it is so ordered." *United States v. Poindexter, supra* at 1485.

**9.** The cases cited by the Government and by the Magistrate Judge are distinguishable—at least in part—because none deals with a local rule on *Brady* discovery as explicit as that of this district. Moreover, in at least one of the cases cited, the

### C. Scope of Brady

#### 1. Promises, Rewards and Inducements

■ The defense requested promises, rewards and inducements offered to government witnesses. The motion was opposed by the Government on the grounds that it would include the identities of cooperating witnesses who received immunity from the Government. Nevertheless, the Government agreed to identify such witnesses seven days before trial.

The Magistrate Judge denied the defense motion to the extent that it sought earlier disclosure of the identity of cooperating witnesses who received immunity or other consideration. At the same time, the Court ordered the government to turn over what amounted to generic information about promises, rewards and inducements, within fourteen days of the Court's order i.e. witness A received these promises, witness B, these promises.

Court appeared to adopt the general principles outlined above. In *United States v. Presser*, 844 F.2d 1275 (6th Cir.1988), for example, the Court held that material which was arguably exempt from pretrial disclosure by the Jencks act, yet also arguably exculpatory material under *Brady*, had to be disclosed to defendants "in time for use at trial." The Court took the position that *Brady* was complied with so long as the timing of the disclosure preserved the defendant's ability to "defend himself effectively at trial". 844 F.2d at 1283. It thus harmonized *Brady*'s due process requirements and the Jencks act by concluding that disclosure of exculpatory information mid trial was adequate.

On that issue, when disclosure is necessary for an effective defense, I do not agree. If the exculpatory information, for example, was a statement of an identification witness, identifying someone other than the defendant, clearly it must be turned over to the defense in time for the defense to make essential strategic decisions. Plainly, it would not be adequate to turn over such information after a witness had testified. *See e.g., United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984).

The extent to which mid trial disclosure suffices for effective advocacy within the meaning of *Brady* and its progeny obviously depends upon the nature of the information. One can imagine a continuum of information that is arguably *Brady* material, ranging from information that clearly exculpates (i.e. the eyewitness identifying someone else), information that materially undermines a central witness or a central prosecution theory or has a substantial mitigating impact

I disagree with the Magistrate Judge's ruling with respect to the issue of earlier disclosure of the identity of cooperating witnesses. The information requested—the promises, rewards and inducements offered to witnesses—is both classic *Brady* material and is specially mentioned in the Local Rules.[10] As a general matter, it is not adequate to disclose such information in generic terms. Absent information concerning the identity of the witness, the defense counsel has no way of putting the information in context, of determining its significance in the particular case. Likewise, defense counsel has no meaningful way of investigating further.

Here again, the best procedure is one that tracks Local Rule 116.1. The premise has to be full *Brady* disclosure, and disclosure now, unless and until the Government makes a showing sufficient to meet the requirements of the Local Rule.[11] To date, it has not.

on punishment, all the way to information that is only arguably inconsistent with the prosecution's theory, or that has a relatively insignificant impact on a minor prosecution witness. The Supreme Court has given limited guidance in defining when exculpatory information is material to the defense. In *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) the Court said that "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

The problem is that in most cases, it is difficult to forecast the impact that a particular piece of information will have at trial, where it will fit in the defense preparation, what kind of other challenges it will or will not lead to. Given the difficulties of predicting materiality, the most appropriate rule should be one that errs on the side of disclosure of *Brady* material, unless the requirements of a Rule 116.1 exemption for disclosure are met.

**10.** Local Rule 116.1(a)(5) deals with the general *Brady* obligation. Local Rule 116.1(a)(7) deals specifically with the obligation to disclose "promises, rewards and inducements" of witnesses.

**11.** It is not enough to say that the Government should disclose the minimum exculpatory evidence, and withhold arguably exculpatory information at its peril—i.e. the risk that the information will surface and threaten a conviction or the

Accordingly, I order the Government to fully comply with Rule 116.1(a)(5) and (7), unless and until it seeks relief from disclosure in whole or in part under Rule 116.1(d).[12]

## 2. *Witness' Bias*

Snell Jr. also seeks evidence of bias or prejudice on the part of government witnesses against his client or his family. The Magistrate Judge, in his Order dated June 7, 1995, stated that "the court is unable and unwilling to give or attempt to give an advisory opinion or prediction about which if any specific items arguably falling into the broad categories described by defendants will ultimately constitute exculpatory evidence, in the context of the actual trial of this case." Without addressing this item specifically, the Court ordered "that the motion for exculpatory evidence is ALLOWED to the full extent disclosure is required by Local Rule 116.1(a), including, without limitation, Local Rule 116.1(a)(5) and (7); that the motion is otherwise DENIED." Order, at 3. I disagree. Since the defendant has made a request for specific information under *United States v. Agurs, supra* the Court is obliged to consider whether that information fits within the *Brady* obligation.

There is no question but that as a general matter, the *Brady* obligation includes the requirement to turn over evidence of impeachment. *United States v. Cooper* 662 F.Supp. 913, 919 (D.R.I.1987). The seminal cases of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)[13] and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)[14] involved the failure to disclose that the prosecution's key witnesses had personal interests at stake when they testified. Impeachment evidence directly affects the defense counsel's ability to cross examine, and thus the defendant's right to confront the witnesses against him. While there may be impeachment evidence that is too attenuated to fit within the *Brady* obligation, that is not material to the defense case, as that has been defined in the case law[15], the evidence requested by the defendants does not fit within that category.

Here again, the assumption should be that the information must be turned over, unless and until the Government can make the appropriate showing under Local Rule 116.1(d).

## II. *EARLY DISCLOSURE OF JENCKS ACT MATERIAL*

Defendant Snell, Sr. seeks reconsideration of the Magistrate Judge's order bar-

---

conduct of the trial. Such an approach encourages brinkmanship, taking one's chances that at a later date, when the pressures to continue a trial or sustain a conviction are greatest, the issue will be dealt with more leniently by the Court. Rather, since the *Brady* obligation is a constitutional one, the Government should err on the side of disclosure to the defense or laying out before the Court their considered and important reasons for nondisclosure.

**12.** I assume that if the Government meets the test for exemption under 116.1(d), the Magistrate Judge would also consider less restrictive means of protecting witnesses, such as disclosing the information to the defendants subject to a protective order, or giving the government an opportunity to depose witnesses in advance of trial prior to disclosure.

**13.** In *Giglio*, a witness had testified in return for a government promise not to prosecute. The witness denied this at trial and the prosecutor made no move to correct the lie. The Court reversed in the light of both *Brady*, and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), in which the court held that the

prosecutor's failure to correct a direct lie denied the defendant due process. In effect, the Court's analysis suggested that there was no material difference between the jury hearing an affirmative statement that no promises were made to the witness, and the failure of the jury to hear about promises to the witness. *Babcock, supra* at 1142.

**14.** In *Bagley*, the Government did not disclose that any "deals, promises or inducements" had been made to its two principal witnesses. In addition, the Jencks act material covering these witnesses consisted of affidavits concluding with the statement, "I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it." It was not until after a conviction, in response to requests under the Freedom of Information Act, 5 U.S.C. section 552 and 552a, that the defendant received copies of contracts that the witnesses had signed with the Government authorizing the payment of money in return for their cooperation.

**15.** The test for materiality has been outlined in *Pennsylvania v. Ritchie, supra.*

ring early disclosure of Jencks Act material based on statements by an Assistant United States Attorney in an unrelated case. The Magistrate Judge took the position that the AUSA in this case was not bound by statements made by another AUSA in an unrelated case.

While that is true enough, I believe that I can consider the colloquy as an indication of what others on this bench and in the United States Attorney's office take to be the law.

In the transcript presented before the Court[16], AUSA Libby sought early disclosure of defense statements, i.e. before the defense witness actually took the stand. The defendant claimed that just as the government regularly protested early Jencks disclosure of prosecution witness statements, so did the defense protest early defense statement disclosure. After additional discussion, all parties are heard agreeing that the Court had the discretion to order early disclosure of prosecution witness statements on a "case management basis". When counsel sought to clarify the Government's position about the Court's discretion to order early Jencks disclosure, the Court said: "They've pressed for it and so they are judicially estopped from taking a different position in another case."

Two things about this colloquy are significant. First, another judge of this court has taken the position that for case management purposes there can be early Jencks disclosure. While I do not agree that it binds this court either as a matter of precedent or of estoppel, it is significant. Second, the AUSA and the defense both agreed that the Court had that discretion.

The voluntary early production of Jencks has been called "a salutary practice" *United States v. Campagnuolo,* 592 F.2d 852, 859 n. 3 (5th Cir.1979), *United States v. Murphy,* 569 F.2d 771, 773 n. 5 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978). Several courts have ordered early production in the interest of fairness, efficiency and the avoidance of surprise. *See e.g., United States v. Hubbard,* 474 F.Supp. 64 (D.D.C.1979) (where government represented it would turn over Jencks statements

prior to trial, court held it to its promise); *United States v. Narciso, supra* at 270–71 (E.D.Mich.1976) (ordering pre-trial disclosure of Jencks statements to promote efficiency and fairness).

The language of the Act is direct: "No statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. section 3500(a). As noted above, Jencks was enacted in response to concerns that the fundamental fairness of a trial would be undermined, including counsel's opportunity to defend, to confront witnesses, to fully represent the client, if witness statements were not disclosed in timely fashion to facilitate cross examination. In response to a fount of cases which seemed to open the door to rummaging through the government files, and hoping to strike a balance between issues of fairness to the defense and law enforcement needs, Congress passed the Jencks act.

I agree with Judge Young that nothing in the statute, preempts the court's ability, consistent with its obligations over case management, to order earlier disclosure than required by the Act. If there is no law enforcement reason prohibiting earlier disclosure (i.e. threats to witnesses, etc) then the concerns undergirding Jencks are simply not triggered.

Accordingly, the Government is ordered to provide the Court with its estimate of when Jencks material can be made available to the defendants, so long as that date is no longer than September 1, 1995.

### III. INFORMATION UNDER THE PETITE POLICY

■ Defendant Snell Jr. seeks reconsideration of the order of the Magistrate Judge denying him certain information concerning the Department of Justice's compliance with the Petite policy. I deny Snell Jr.'s motion.

---

**16.** The Court was not provided with the name of the case, only a transcript of the colloquy.

The Petite policy is an internal Department of Justice policy which "precludes the initiation or continuation of a federal prosecution following a state prosecution or a prior federal prosecution based on substantially the same act, acts or transactions unless there is a compelling federal interest supporting the dual or successive federal prosecution." United States Attorney's Manual, section 9–34. The policy was implemented following the Supreme Court's decision in *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960).

There is no question but that as an internal DOJ policy, disclosure of compliance with the Petite policy fits within none of the categories of the Federal Rules of Criminal Procedure, the local rules, or any of the constitutional obligations defined above. The defendant cannot seek dismissal of these charges if the policy is not complied with. *See Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977); *United States v. Thompson,* 579 F.2d 1184, 1188 (10th Cir.1978). If the defendant had a theory of bad faith or selective prosecution, conceivably the information might have relevance; no such theory has been advanced. *See e.g. United States v. Jordan,* 870 F.2d 1310, 1317 (7th Cir.1989). Arguably, the information might have relevance to sentencing, i.e. that the AUSA misrepresented the nature of the prosecution in order to secure DOJ approval. Whether such a misrepresentation would be sufficient to depart under the guidelines is speculative at this time. Moreover, the defense will have an opportunity to revisit the issue if there is a conviction, during the preparation of the presentence materials. At this point, the issue is premature.

If there is no use to which such information may be put at the trial, the defendant is not entitled it.

## IV. CONCLUSION

The decision of the Magistrate Judge barring disclosure of *Brady* material that also fits within Jencks at a point earlier than the Jencks Act requires is **REVERSED.** The decision of the Magistrate Judge permitting the government to withhold information concerning promises, rewards, and inducements where that information would also disclose the identity of government witnesses is **REVERSED.** The decision of the Magistrate Judge refusing to order discovery with respect to information concerning any witness' bias against Snell Jr.'s family is **REVERSED.** The decision of the Magistrate Judge denying Snell Jr.'s motion for discovery concerning the government's compliance with the *Petite* policy is **AFFIRMED.**

**SO ORDERED.**